```
                                          1
 1         IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                   EASTERN DIVISION

 3   VISHVA DESAI, on behalf of herself) Docket No. 11 C 1925
     and others similarly situated,    )
 4                                     )
          Plaintiffs,                  )   Chicago, Illinois
 5                                     )   August 19, 2011
     v.                                )   9:30 o'clock a.m.
 6                                     )
     ADT SECURITY SERVICES, INC.,      )
 7                                     )
          Defendant.                   )
 8
 9        TRANSCRIPT OF PROCEEDINGS - Status and Motion
              BEFORE THE HONORABLE ARLANDER KEYS
10
11   APPEARANCES:
12   For the Plaintiffs:    BURKE LAW OFFICES LLC by
                            MR. ALEXANDER HOLMES BURKE
13                          155 North Michigan Avenue, Suite 9020
                            Chicago, IL  60601
14
                            MURRAY MURPHY MOUL & BASIL LLP by
15                          MR. BRIAN KEVIN MURPHY
                            1533 Lake Shore Drive
16                          Columbus, OH  43204

17   For the Defendant:     PEPPER HAMILTON LLP by
                            MR. MICHAEL E. BAUGHMAN
18                          3000 Two Logan Square
                            Eighteenth and Arch Streets
19                          Philadelphia, PA  19103-2799

20                          POLSINELLI SHUGHART PC by
                            MR. JOHN A. LEJA
21                          161 North Clark Street, Suite 4200
                            Chicago, IL  60601
22
     Court Reporter:        GAYLE A. McGUIGAN, CSR, RMR, CRR
23                          Federal Official Court Reporter
                            219 South Dearborn, Room 1944
24                          Chicago, Illinois 60604
                            312-435-6047
25                          Gayle_McGuigan@ilnd.uscourts.gov
```

```
                                          2
 1        (In open court.)
 2        THE CLERK:  11 CV 1925, Desai versus ADT Security
 3   Services, for a status and a motion.
 4        THE COURT:  Morning, Counsel.
 5        MR. BURKE:  Good morning, your Honor.
 6        MR. MURPHY:  Good morning, your Honor.
 7        MR. BAUGHMAN:  Good morning, your Honor.
 8        MR. LEJA:  Good morning, your Honor.
 9        MR. BURKE:  Good morning, Judge.  Alexander Burke for
10   the plaintiffs.
11        THE COURT:  Good morning, Mr. Burke.
12        MR. MURPHY:  Good morning, your Honor.  Brian Murphy
13   on behalf of the plaintiffs as well.
14        THE COURT:  Good morning.
15        MR. BAUGHMAN:  Michael Baughman with Pepper, Hamilton,
16   here for defendant ADT.
17        MR. LEJA:  Good morning, your Honor.  John Leja with
18   Polsinelli, Shughart, on behalf of defendant ADT.
19        THE COURT:  Okay.
20        MR. BURKE:  Judge, we're here this morning on the
21   plaintiffs' motion to compel.
22        This is a telemarketing TCPA class action against ADT
23   Security Systems.
24        Voluminous briefs have been filed.
25        THE COURT:  Too many.  I read them all.  I've read all
```

```
                                          3
 1   of them.  And I gave you leave to file one motion -- one -- one
 2   of the exhibits under seal, and you have another motion to file
 3   two others under seal, right?
 4        MR. BURKE:  Yes.
 5        THE COURT:  Okay.  And I'm also granting that motion.
 6        MR. BAUGHMAN:  Thank you, your Honor.
 7        MR. BURKE:  Thank you.
 8        THE COURT:  So what motion -- the one that I didn't
 9   already grant -- those two of them.  I granted one -- you got
10   the minute order on the first one, right?
11        MR. BURKE:  Yes.
12        MR. BAUGHMAN:  Yes, your Honor.
13        THE COURT:  Okay.
14        MR. BURKE:  Judge, there are four categories of
15   documents that we're asking for in this case:
16        The first is complaints regarding telemarketing;
17        The second is class information;
18        The third is marketing information;
19        And fourth is TCPA compliance information.
20        ADT has disclaimed any knowledge of telemarketing
21   calls.
22        Our understanding of what goes on here, at least right
23   now, is that there is a complex web of agents and sub-agents
24   that make these calls for ADT, some calls in ADT's name and
25   some calls not in ADT's name, but what seems clear to us is
```

```
                                          4
 1   that ADT benefits from all these calls.
 2        So we're -- you know, we're asking for this
 3   information.
 4        ADT has given us scant documents, almost no responses
 5   to interrogatories.
 6        They did send us supplemental production after we
 7   filed our motion.
 8        You know, we've had -- not only are there voluminous
 9   filings, but we've had lots of talks about this discovery.
10        Last time we were in, Judge, before the motion to
11   dismiss before Judge Bucklo had been denied and before the
12   motion to stay discovery and bifurcate discovery had been
13   denied, you know, the case was in a much different position.
14        You know, we think we're entitled to all the stuff
15   we've asked for.
16        MR. BAUGHMAN:  Your Honor, I -- there's 70 document --
17   there's 70 discovery requests that are at issue.  And after
18   reading the plaintiffs' motion, I'm still not entirely sure
19   which of those discovery requests they want answers to other
20   than everything.
21        And just by way of background, my understanding of how
22   we got here today was we originally were in front of
23   Judge Bucklo, and our position was we didn't make these calls,
24   we don't know who did make these calls, we had nothing to do
25   with these calls, so that we're not a proper defendant in this
```

5

 1  case.
 2     And, therefore, discovery in the outset ought to be
 3  limited to determining who made these calls, did they have a
 4  connection to ADT, is ADT a proper party here.
 5     Judge Bucklo thought that raised issues and referred
 6  that -- referred those issues to your Honor.
 7     And the last time we were in front of -- I confess I
 8  wasn't the one here, but I did read the transcript, your Honor.
 9     And the discussion was -- I think your Honor
10  understood that this is a case that needs some limits on
11  discovery.
12     And that's what we're asking for here is just let's
13  take this in steps and stages, given that we don't think that
14  these plaintiffs even have a claim against the defendants and,
15  therefore, no standing to pursue a class action.
16     And what your Honor instructed us to do was let's meet
17  and confer and let's try to narrow the issues.  And that's what
18  we tried to do, your Honor.  We sent them an eight-page
19  detailed, single-spaced letter, addressing each of their
20  discovery requests and offering compromises.  And we never
21  heard back.  Instead, we got a motion to compel asking for
22  everything.
23     And I think our overall position here, your Honor, is
24  we're willing, even though we don't think some of this stuff is
25  relevant, we're willing to give them information in stages.

6

 1  Let's digest it and see does this have something to do with
 2  these claims.
 3     So, for example, on the complaints issue, which is the
 4  first issue that they raise, your Honor, we gave them a list
 5  detailing every TCPA complaint that ADT has received in the
 6  last year.
 7     This is something that we submit to the FTC.  We
 8  submit detailed information to the FTC about our compliance
 9  with the consent decree.
10     Now, that consent decree primarily deals with
11  do-not-call or do-not-robocall, but we gave them that list of
12  complaints, your Honor.
13     And what we suggested that they do in the letter, look
14  at that and tell us which of those complaints do you think have
15  something to do with this case, because I'll tell, your Honor,
16  by our count, there's -- I think there's 700 complaints.  Maybe
17  100 have anything to do with robocalls or pre-recorded
18  messages.
19     So in reading the -- we never got a response to our
20  detailed letter, your Honor.  We got their motion.
21     In reading their reply brief, for example, they raised
22  this issue about, well, there's a number of calls that were
23  made from the same phone number that's at issue in the Desai
24  case.
25     And after reading that, your Honor, I actually think,

7

 1  okay, they have a point on that.  We'll give them the detailed
 2  investigative files on those ten complaints.  Look at the
 3  chart.  Tell us which other ones you think are appropriate, and
 4  we'll consider that.  But, your Honor, there's really been no
 5  meet and confer that's gone on here.
 6     And Mr. Burke said there's been numerous
 7  conversations.  There was one phone call, and that was it.
 8     So, you know, our overall position, your Honor, is
 9  that this is a case that ought to proceed in stages and that we
10  ought to manage the discovery process here before we're
11  required to, you know, produce every document.  And they want
12  not only the documents in our possession, but the documents
13  apparently in possession of 500 authorized dealers who are
14  independent business entities who we have no authority to get
15  information from.
16     Let's take this in stages because coming up next
17  month, your Honor, we're taking the depositions of the people
18  who made these phone calls.  And I think those depositions are
19  going to clearly show we had nothing to do with these calls.
20  And if that's the case, they don't have a claim, and that's the
21  end of the case.
22     So, your Honor, that's our overall position here.
23     THE COURT:  I would not -- I certainly would not
24  assume that this case is going to go away after you have taken
25  the depositions of these people that you have scheduled in

8

 1  September for depositions.
 2     Of course, as an advocate I expect you to take that
 3  position.
 4     I know -- also I recognize that in defending your
 5  client that it is certainly expected by this Court that you
 6  will engage in zealous advocacy on behalf of your client and
 7  you will attempt to limit information that you will give to the
 8  other side.  I don't blame you.  If I were in your shoes, I'd
 9  be doing the same thing.
10     On the other hand, I take seriously the discovery
11  rule.  And in respect to the production of documents and
12  answering of interrogatories, I think if I find that the
13  information that is being sought by either side is relevant to
14  any of the issues in the case or is calculated to lead to
15  admissible evidence or arguably could lead to admissible
16  evidence, and if it's not covered by privilege, on both
17  instances you're going to produce it.
18     That's the way I look at discovery, and I've been
19  looking at it this way for the last 16 1/2 years.
20     And if it's not -- you're not arguing that any of this
21  information is unduly burdensome, because if you do, then
22  you've got to be very specific about why it's so burdensome.
23  How many people are going to take -- are going to be devoted to
24  retrieving this information?  How many -- how many man hours?
25  How much is it going to cost, if it's going to be hundreds of

9

1 thousands of dollars or if it's just going to be thousands of
2 dollars?  Take all of that in consideration.  How was this
3 information stored?  What do you have to do to get this
4 information?
5             There has not been a defense to objection to any of
6 this except in the boilerplate.  Of course, I -- you know, in
7 the boilerplate language, that's always -- you know, it's
8 irrelevant, it's unduly burdensome, it's -- you know, the
9 language that you use in this so that -- all the lawyers use
10 the same language, and I'm used to seeing that.
11             But you've got to be a lot more specific as to what
12 the burden -- burden here is.
13             With respect to the FTC document, the information that
14 you were required to produce to the FTC under the consent
15 decree, I don't know how you can argue that's burdensome.
16             MR. BAUGHMAN:  I don't think that we've been arguing
17 that that's burdensome.
18             Your Honor, I think our position on that is it's not
19 relevant.
20             THE COURT:  They're not relevant?
21             MR. BAUGHMAN:  Correct, your Honor.
22             THE COURT:  And why isn't -- why couldn't -- why isn't
23 the discovery request that's made to you regarding the FTC
24 document, why isn't it calculated to lead to admissible
25 evidence?

10

1             MR. BAUGHMAN:  Your Honor, the claim that these
2 clients are bringing is under 227(B), which relates to
3 pre-recorded messages.  And the issue that we had with the FTC
4 related to a different section of the TCPA, 227(C), which deals
5 with do-not-call issues.  So most of the information that we're
6 providing to the FTC has to do with that issue and not with the
7 robocall issue, your Honor.
8             And also these plaintiffs, respectfully, don't have
9 standing to enforce the FTC consent decree.
10             We've been providing information to the FTC.  They
11 haven't raised any issues with respect to it.
12             In addition -- that's another reason why we think it's
13 irrelevant, your Honor.
14             THE COURT:  But the wording of the consent decree is
15 not limited to do-not-call, is it?  It's not.
16             MR. BAUGHMAN:  It says that we need to comply with the
17 TSR, which -- I understand --
18             THE COURT:  Telephone --
19             MR. BAUGHMAN:  But the issue that that case arose out
20 of and the issue that the FTC was primarily concerned with was
21 do-not-call issues and not robocall issues.
22             THE COURT:  Okay.  And I understand your argument
23 there that -- but the --
24             MR. BAUGHMAN:  And, your Honor, we have given them
25 information that we provided to the FTC.

11

1             Their motion makes it seem like we've given them
2 nothing, which is not true.
3             This chart we gave to the FTC.  We also gave them our
4 most recent annual report to the FTC, with attachments.  The
5 only attachment that we haven't included are the detailed
6 complaint files because we think that those aren't relevant,
7 your Honor.
8             We have two issues with that:
9             One is if they don't relate to robocalls, they're not
10 relevant;
11             Two, to the extent there's contact information in
12 there, that's not appropriate to provide to the plaintiffs at
13 this point because --
14             THE COURT:  Why isn't it?
15             MR. BAUGHMAN:  Because our concern is that they're
16 going to use that information to call these people and solicit
17 additional -- additional plaintiffs.
18             And we cited a number of cases in our brief which make
19 clear that that's not appropriate, your Honor.
20             MR. MURPHY:  Your Honor, those people are witnesses.
21 I mean, if there are people in there who are complaining about
22 the same conduct, I mean, we have -- it's not because we have a
23 putative class claim and all of a sudden they're not allowed to
24 give us witnesses that may be in their class.  We're allowed to
25 talk to those people, understand their experience, who did they

12

1 talk to, when were the calls made.  I mean, we're allowed to
2 investigate our case in that way.
3             And I don't understand where -- you know, they say
4 they give us this list of complaints.  Well, they give us a
5 summary.  So somebody prepared the summary.  I don't know what
6 they -- what they did choose to call or not call from the
7 detailed investigative files.
8             But if I'm entitled to the summary chart, well, I
9 should be entitled to the back-up behind the summary chart so I
10 can look through the files myself, figure out what the people
11 were complaining about, the time they were complaining about,
12 because a lot of these things, your Honor, sometimes ties up if
13 somebody -- was somebody complaining on, you know -- were there
14 a series of calls made on August 15 that consumers are
15 complaining about?  You know, do the -- are there geographic
16 areas where those are happening?  I mean, we have a lot of
17 stuff that we have to investigate.
18             And I don't get this point where, you know, they're
19 afraid that we're going to go and get one of these people
20 that -- who we think is a witness and bring them in here as a
21 class rep.  We've got two class reps.  We don't need any more
22 class reps.
23             But we are certainly entitled to talk to class
24 members, find out what their experiences are, and see if that
25 helps, you know, build our case.

13

1  There's nothing inappropriate about talking to
2  witnesses.
3      And I don't know why in a class case all of a sudden,
4  you know, they're entitled to shield that information from us
5  when, you know, these consumers contacted them and complained.
6  They got the information.  Why aren't we entitled to the
7  information?
8      MR. BURKE:  Furthermore, the chronological scope of
9  the production, not only was it redacted, but they only gave us
10 one year of complaints and there were 700 of them.  And they
11 admitted just a minute ago that 100 of them relate to our
12 calls --
13     MR. BAUGHMAN:  I did not.  We did not -- we did not --
14     THE COURT:  Wait, wait, wait.  One -- one at a time.
15 Court reporter is only able to take one at a time.
16     MR. BURKE:  Yes.  We -- we have a record of what he
17 said.  It's something about 100 calls relating to the
18 plaintiffs, but the record will bear it out.
19     But we've got a four-year class period.
20     Furthermore, there's not only these submissions to the
21 FTC that exist.
22     There are internal documents regarding the
23 investigations of these complaints.
24     There are also correspondence with the FTC.
25     All we have are letters from ADT's other lawyers that

14

1  defended with regard to TCPA issues to the FTC, but there are
2  communications from the FTC to ADT.
3      And the other point I have is with regard to the
4  burdensomeness of this stuff, I specifically asked ADT to tell
5  us what the burden is during our Rule 26 -- 37 conference.
6      I specifically asked for the information.
7      I asked for a conference with the e-discovery liaison,
8  and it never happened.
9      And we did not ignore what they gave us.  We attached
10 almost every single piece of paper that we had to our motion
11 and our reply brief.
12     The complaints that we got are in the record.
13     The documents -- the letters from ADT to the FTC are
14 in the record.
15     This is not -- I mean, this is a lot of stuff but --
16     THE COURT:  I've seen it.
17     MR. BURKE:  It's all in the record.  This is all
18 discoverable information, and we ask that it all -- that it be
19 compelled.  This is reasonable stuff.
20     MR. BAUGHMAN:  Your Honor, their request includes
21 things like all documents concerning the TCPA.
22     And I still, to this day, don't -- what document
23 requests are there that you think that are -- responses that we
24 gave you aren't adequate?
25     I think the appropriate course, your Honor --

15

1  Mr. Murphy references these complaints.
2      The complaints that have nothing to do with robocalls
3  clearly are not relevant.
4      Look at the chart we gave you.
5      Today I told you I would give you the files relating
6  to these eight or ten calls that relate to this telephone
7  number.
8      Look at the chart we gave you and tell us what other
9  information you think is appropriate, and we can meet and
10 confer about that.
11     There has been no effort, your Honor, on the other
12 side to, you know, go through these one by one.  Okay, we
13 offered to give this, we think you should give us this, we
14 think you should do searches in this way.  I mean, there's been
15 no meet and confer --
16     MR. MURPHY:  Well, your Honor, if I might, if you go
17 through his eight-page letter, which we got, you know, a few
18 days before we had to file our motion to compel, I mean, it
19 largely restates the position we've been -- we were told.
20 Originally when we got the responses in I think at the end of
21 May, early June, that we -- when we met and conferred with them
22 over the phone, it's -- we -- the problem we're dealing with
23 here, your Honor, is they continue to want to bifurcate
24 discovery and so -- the Court hasn't ordered bifurcation of
25 discovery, and so it's become pretty clear to us the way

16

1  they're going to bifurcate discovery is by just, you know,
2  continuing to have these fights over and so we don't -- you
3  know, they give us, you know --
4      MR. BURKE:  Piecemeal.  That's what we're getting is
5  piecemeal.  We'll give you the few documents within a certain
6  category that we think aren't so damaging to us.  I mean,
7  that's what we got.  And we're going to redact the real
8  information --
9      THE COURT:  If I were representing ADT, I would be
10 doing the same thing.
11     MR. BURKE:  I'm not mad at the lawyers, but I think
12 that -- I think that we're entitled to this stuff.
13     MR. MURPHY:  Your Honor, in particular, you know,
14 typically in this day and age with these kind of -- you know,
15 talking about ESI.  And so, you know, one of the first things
16 you'd -- we'd have is they would say, you know, we've done a
17 search of our systems and, you know, there's three million
18 documents so we need to work on, you know, keyword searches and
19 things like that, and we've offered to do that and because
20 they -- again, they don't want to do this.  They want to sort
21 of, again, bifurcate discovery, practically, even if the Court
22 is not going to order it.  And that's what this -- that's what
23 their responses reflect.
24     I mean, we should be entitled to all of the
25 complaints.  We should -- you know, one of the things they've

17

 1  continued to stiff-arm us on is the relationship with their
 2  dealers.
 3              One of the things in Judge Bucklo's decision is, you
 4  know, we don't know how this is going to take form.  What we
 5  know is there are calls being made.  ADT products are being
 6  offered.  So, clearly, money is flowing.  It's going to be
 7  flowing back to ADT in one way or another.  And so a lot of our
 8  discovery goes to, you know, what is ADT's knowledge of what's
 9  going out there by its dealers and the -- those dealers'
10  marketing agents?  What knowledge do they have of that?
11  What -- you know, how are they getting paid?  All of that stuff
12  that we're entitled to, to prove up what Judge Bucklo said in
13  her -- we're going to need to prove up, which is, you know,
14  even if they weren't specifically authorizing this stuff, you
15  know, they also can't stick their head in the sand and know
16  that money is flowing their way through illegal, you know,
17  robocalls and -- and they just sort of look the other way.
18  They're not allowed to do that.
19              MR. BURKE:  The relationship between ADT and these
20  people that market for it are -- is similar to the relationship
21  between a debt collector and its creditor, although it's a more
22  forceful relationship on the part of ADT.
23              ADT is these marketers' boss.  They are doing work for
24  ADT.
25              THE COURT:  They say that they are third-party

18

 1  contracting -- I mean they are independent contractors --
 2              MR. BAUGHMAN:  It's not the authorized dealers who are
 3  making these calls, your Honor.
 4              MR. BURKE:  How do we know?  They haven't produced
 5  anything regarding that.
 6              MR. BAUGHMAN:  There's no evidence that the authorized
 7  dealers made the calls --
 8              THE COURT:  One at a time.  One at a time.  One at a
 9  time, guys.
10              COURT REPORTER:  Thank you.
11              MR. BAUGHMAN:  They're -- they're trying to blur the
12  line here, your Honor, between authorized dealers and people
13  like the three entities which we've identified in this case who
14  we have no control over.
15              I mean, we've had to serve subpoenas on them.  We
16  have -- one of them we served a subpoena.  He didn't respond to
17  any motion to compel pending.
18              We have no control nor knowledge of these people who
19  are making these calls.
20              We didn't learn the identity of these people until we
21  were able to serve subpoenas in this case.
22              THE COURT:  Do you think that they might be making
23  these calls out of the blue and even though -- mentioning --
24  mentioning your name, even though you're not paying them?
25              MR. BAUGHMAN:  We're not paying them, your Honor.

19

 1              I don't know -- we'll find out when we take their
 2  deposition what is going on here; but, I mean, they could be
 3  people who are independently trying -- first of all, it could
 4  be people who are conducting a scam.
 5              We have cases in which people call up and they say
 6  they're from ADT and they show up at the door, and it ends up
 7  being someone else.
 8              THE COURT:  Maybe plaintiffs' counsel is setting this
 9  up.
10              MR. BURKE:  2.6 million --
11              MR. BAUGHMAN:  Let's take these depositions and find
12  out what's going on here.
13              MR. MURPHY:  Your Honor, let's -- let's -- we have to
14  dispel this sort of scam idea because let's remember with Phil
15  Charvat's call, we know that was done by an entity,
16  self-identified, selling ADT, Direct Savings.
17              In one of the few interrogatory responses we've got,
18  they've identified Direct Savings as having some form of a
19  business relationship with one of their largest authorized
20  dealers.  Okay?
21              And so they -- they knew about that, which to us
22  connects the dots.
23              And, your Honor, that's why we believe the scope of
24  our discovery is probably broader than it might be in some
25  cases, but that's because we've got to follow the money,

20

 1  however it flows, from ADT down to these people because they
 2  are making these calls for a reason.  They're not doing it for,
 3  you know, for charity.  And we know that money is going to flow
 4  some way from ADT, whether it's down through their authorized
 5  dealers or -- we don't know yet, but we know that money is
 6  going to flow down, and that's why we have to understand the
 7  full context of those relationships with their dealers, how
 8  they get business.
 9              The question -- for instance, we don't know, you
10  know -- you know, do they ask questions when people call?  You
11  know, how did you get -- typically most companies say, How did
12  you get to us?  Right?  For marketing purposes, you want to
13  know that.
14              Well, you would think, you know, somebody might along
15  the way have said, I got through -- you know, I got robodialed.
16  I got a recorded call.  I mean, should have that information.
17              So we want to look at that entire -- that entire
18  universe to -- to prove up our case.
19              MR. BURKE:  And there's a lot of money involved here.
20  I mean, as we -- as we mentioned in our -- in our motion, EMI,
21  the company in California that we believe made the Desai call,
22  received $15 for each lead that went to ADT.
23              MR. BAUGHMAN:  It didn't go to ADT.  There's no
24  evidence it went to ADT --
25              THE COURT:  Defendant says that they weren't calling

## 21

```
 1  on behalf of ADT.
 2          COURT REPORTER:  One at a time, please.
 3          MR. BAUGHMAN:  Your Honor --
 4          COURT REPORTER:  I'm sorry, please --
 5          THE COURT:  And I listened to the disk that you folks
 6  sent to me and they didn't mention ADT, but I wonder who were
 7  they soliciting for?
 8          MR. BAUGHMAN:  I don't know.  We'll find out on
 9  September 8th when we take that person's deposition --
10          THE COURT:  They certainly talked about home
11  installation of the --
12          MR. BAUGHMAN:  Your Honor, let's take the Direct
13  Savings --
14          THE COURT:  Go ahead, Counsel.
15          MR. BAUGHMAN:  -- the Direct Savings example that they
16  use.  Okay?
17          Direct Savings is not an agent of ADT.  ADT didn't
18  even know that they had a contract with Eversafe until this
19  case arose.  Okay?
20          The independent con -- the authorized dealers are
21  independent contract -- independent contractors who are
22  responsible for their own marketing, okay?
23          The authorized dealers sign certifications under oath
24  saying they will comply with the TCPA and saying that anyone
25  that they hire will also comply with the TCPA.
```

## 22

```
 1          Mr. Murphy didn't mention it, but we gave them the
 2  contract with -- between Eversafe and Direct Savings, which
 3  Eversafe gave to us, and it specifically forbids conducting
 4  telemarketing through pre-recorded messages.
 5          So if Direct Savings was involved -- and we don't know
 6  because we haven't taken their deposition yet, but we're
 7  trying -- it had nothing to do with -- they were acting
 8  contrary to their contract with Eversafe, and we didn't have
 9  anything to do with it, your Honor.
10          THE COURT:  But isn't plaintiff trying -- one of the
11  things that plaintiff is trying to do is to determine
12  whether -- how you enforce the -- whether you discipline and
13  whether you terminate people or --
14          MR. BAUGHMAN:  We've offered to give them a response
15  to that information, your Honor.
16          THE COURT:  But -- because under the consent decree,
17  you -- you do have the duty to police these --
18          MR. BAUGHMAN:  Right.  And they have that information,
19  too, your Honor.
20          We submit to the FTC and we provide them with
21  third-party monitoring reports.
22          If a dealer -- if an authorized dealer elects to
23  telemarket that, to fill out that long affidavit, and they have
24  to hire a third-party compliance person, okay?
25          And by the way, these dealers are sophisticated
```

## 23

```
 1  entities with their own counsel who they have subpoenaed, okay?
 2  So they can deal with those -- those independent entities
 3  through those subpoenas.  But they -- they have to hire
 4  third-party monitoring companies.  And those reports were
 5  provided as part of the FTC material.
 6          And, your Honor, part of the problem I'm having here
 7  is I -- I still -- their interrogatories read like, Give me
 8  everything relating to the TCPA.
 9          There's literally a request in there everything
10  relating to robodialers.
11          They -- we are offering with them to -- to meet and
12  confer and discuss what specifically is it that you want.  And
13  instead we get a response saying "everything."
14          And the first step here, your Honor, should be let's
15  get specifics on what you want here other than you want us to
16  send out 70 document requests to 500 dealers.
17          THE COURT:  Okay.  Mr. Burke or Mr. Murphy -- no, tell
18  them -- tell them now, on the record, when you ask for all
19  documents relating to the TCPA --
20          MR. MURPHY:  TCPA compliance, your Honor.
21          THE COURT:  Okay.  TCPA compliance.  Okay.
22          MR. MURPHY:  And we were very specific about -- we
23  met -- if you notice in your motion to compel, we did have sort
24  of a catch-all that said all TCPA, but we didn't move to compel
25  on that --
```

## 24

```
 1          THE COURT:  I missed the word "compliance."
 2          MR. MURPHY:  Compliance.
 3          MR. BAUGHMAN:  There's a separate request that -- all
 4  documents --
 5          THE COURT:  One at a time now.  Come on.
 6          MR. MURPHY:  If you read our motion to compel, we did
 7  not move to compel on that request.  I acknowledge that that
 8  may be overbroad.  And TCPA compliance gets us there.  But --
 9          THE COURT:  Remember the court reporter only can take
10  down one at a time.
11          MR. MURPHY:  I'm sorry.
12          The funny one he brings up is, you know, we ask for
13  all documents relating to robodialing.
14          Well, your Honor, I've got to be honest with you.  I
15  want everything that ADT has in its records regarding
16  robodialing because, you know, robodialing is exactly what our
17  claim is.
18          And so if they have documents relating to robodialing,
19  in whatever form, I think we're entitled to that.  That's
20  clearly likely to lead to the discovery of admissible evidence
21  in this case.
22          MR. BURKE:  We didn't ask for everything having to do
23  with their telephones.  Not -- we're not asking to compel
24  everything having to do with marketing.
25          We limited to robocalls, which are the exact subject
```

25

1  of this case.
2       MR. BAUGHMAN:  Your Honor, that request would include,
3  for example, like an e-mail where somebody sends an article to
4  somebody else just noting, hey, look what the FTC is saying
5  about robocalling --
6       MR. BURKE:  Absolutely.  That bears on willfulness.
7       THE COURT:  Wait a minute, wait a minute --
8       MR. BAUGHMAN:  So under that theory, they're asking us
9  to search the e-mails of, what, every employee of ADT?  We have
10 tens of thousands of employees.
11      MR. MURPHY:  Your Honor, if I might, we went through
12 this exact issue on our meet and confer because we said, okay,
13 let's talk about how your departments are set up.  Okay?
14      Certainly we don't want you to search -- you know, you
15 don't -- you're not searching entire databases of every
16 employee.
17      We started the process in terms of, okay, you know, do
18 you have a marketing department?  Do you have, you know, a
19 telemarketing department?  Do you have -- or how many people
20 are in there?  You know, what -- what systems are they on?
21      And we really didn't get sort of useful information.
22 Because, again, you know, they're the ones claiming unduly
23 burdensome.  They need to establish for us what the problem is
24 because my belief is, your Honor, in some computer systems, the
25 easiest thing may be to simply throw a keyword out,

26

1  "robodialing," and search everybody's e-mail database and see
2  what the hits come up.  If the hits come up with 500,000, well,
3  then that's what you do in the ESI meet and confer is to figure
4  out, well, we're not going to look through 500,000 documents,
5  so let's figure out how to -- how to narrow that -- that
6  keyword search.
7       MR. BAUGHMAN:  Tell us what information you want --
8       THE COURT:  Mr. Baughman, go ahead.
9       MR. BAUGHMAN:  Tell us the information -- your Honor,
10 the record of the meet and confer is -- we said -- we asked for
11 some -- we asked for some additional time to consider other
12 issues.  We sent them a letter saying, look, let's continue to
13 dialogue about this.  This is the information we're willing to
14 give you now.  If you think you're entitled to additional stuff
15 after looking at that, tell us what.  And there's been no
16 follow-up since that telephone call, your Honor.
17      MR. BURKE:  We made it clear in the telephone call
18 that we already had a schedule on a motion to compel.  We told
19 ADT.  We offered some concessions.  We told ADT to produce the
20 stuff it's going to produce by "X" date, and we'll omit that
21 stuff from the motion.
22      Instead of producing stuff -- well, they produced,
23 like, 174 pages of documents or something like that.  And they
24 sent an eight-page letter saying, Oh, yeah, let's -- let's
25 continue -- this is actually after we continued the date for

27

1  their response to our motion to compel a week for -- in order
2  for them to come up with more stuff.
3       Out of that, they got 174 documents.
4       I think -- this is also after we -- during -- during
5  the meet and confer, I asked specifically, like I said, to --
6  to talk to the ESI liaison and to get a detailed description of
7  what -- what their servers and their computer systems looked
8  like.  And Counsel objected and said this isn't a deposition.
9  Totally stonewalled us on what -- on what their ESI looks
10 like --
11      MR. BAUGHMAN:  If they --
12      MR. BURKE:  That's consistent with their position that
13 everything is overburdensome; everything is overly broad; we're
14 not going to give you anything of substance; we're going to
15 pick and choose the small things that don't hurt us too much;
16 and we're going to try to drag -- drag our feet and make the
17 case last six years.
18      MR. MURPHY:  Yeah, and, your Honor, if I might, if you
19 go through the responses, they have this consistent theme time
20 and time again, which is that discovery doesn't relate to your
21 three phone calls.
22      So, you know, if we ask about TCPA compliance, they'll
23 say, well, that's not relevant because it doesn't relate to
24 your three specific phone calls.
25      And we don't think -- you know, discovery is broader

28

1  than that, particularly in this kind of context.
2       You know, they've already established, well, you know,
3  we don't have any records regarding the three -- your three
4  telephone calls.  So when we start asking about, you know, TCPA
5  complaints, TCPA compliance, they say, well, that's not
6  relevant because it doesn't -- we don't have anything related
7  to your three telephone calls.
8       And so that's why the sort of meet-and-confer process
9  was, you know, in our view, a bit of a waste of time because
10 they kept coming back to that essential -- that essential
11 theme, which is they have such a narrow view of what they think
12 we're entitled to in discovery that, you know, we -- clearly,
13 we're never going to make any headway.
14      THE COURT:  Okay.
15      MR. BAUGHMAN:  Your Honor, there is -- first of all,
16 no discovery deadline has even been set in this case.  Next
17 week we're bringing in a bunch of additional parties, so, I
18 mean, they're going to have to answer the complaint, but we're
19 not even at a stage yet to set a discovery deadline.
20      And what makes this -- respond to -- respond to our
21 letter.  Tell us, okay, specifically what information -- what
22 additional information do you need?  Why do you think it's
23 relevant?  Why -- I mean, rather than just filing a motion
24 saying give us everything.
25      I mean, the motion does not detail what specific

29

1 discovery request they're saying. It says see example, you
2 know, and it lists like eight discovery requests, many of which
3 have nothing to do with the categories that they mentioned.
4     MR. BURKE:  The first category we asked for, Judge, is
5 complaints having to do with the TCPA and robodialing.
6     THE COURT:  Okay. Stop right there.
7     Do you have those?
8     MR. BAUGHMAN:  I'm sorry, your Honor?
9     THE COURT:  Do you have those complaints?
10    MR. BAUGHMAN:  We have --
11    THE COURT:  Dealing with --
12    MR. BAUGHMAN:  We have -- we have information -- we
13 have for each of the complaints that -- we provided them with a
14 list of each of the complaints that we received in the last
15 year.  For each of those complaints, there is a file that we
16 submitted to the FTC explaining the investigative process.
17    THE COURT:  And did that -- those files -- did it
18 contain names --
19    MR. BAUGHMAN:  Yes, your Honor.
20    THE COURT:   -- of complainants?
21    MR. BAUGHMAN:  Names, phone numbers, things of that --
22    THE COURT:  Did you give that to them or did you
23 delete that?
24    MR. BAUGHMAN:  I'm sorry, your Honor?
25    THE COURT:  When you submitted it to the FTC, did you

30

1 delete the names then?
2     MR. BAUGHMAN:  To the Federal Government?
3     THE COURT:  Yes.
4     MR. BAUGHMAN:  No, we did not.
5     THE COURT:  Then why do you think you can delete them
6 in this -- from -- from the plaintiffs' counsel?
7     MR. BAUGHMAN:  Because if the Federal Government asks
8 us to do something, I think it's a little different than when a
9 plaintiffs' lawyer asks us to give them identifying information
10 of people who, by the way, called us because they were upset
11 that they received unsolicited calls.  I'm not sure that these
12 people are going to be too excited if they receive a call from
13 a lawyer.
14    But, you know, more to the point, your Honor, most of
15 these complaints have nothing to do with robocalls, and we
16 don't think -- they don't need the contact information.
17    THE COURT:  How many of them dealt with robocalls?
18    MR. BAUGHMAN:  By our count, about 100.
19    MR. MURPHY:  For one year, your Honor.  That's one
20 year.
21    THE COURT:  And the consent decree did not limit the
22 prohibitions to do-not-call.
23    MR. BAUGHMAN:  Your Honor, most -- that's a very long
24 consent decree, most of which talks about sort of processes for
25 complying with do-not-call requirements.

31

1     There are general statements in there saying comply
2 with the TSR.
3     THE COURT:  Okay.  Well, then since you submitted the
4 name -- included the names to the FTC in your reports, I'm
5 going to order that you not -- that you not delete those names
6 from the production that you're making to the plaintiffs'
7 counsel.
8     MR. BURKE:  So, Judge, we'd ask for everything they
9 produced to the FTC within the last four years regarding
10 complaints.
11    THE COURT:  Okay.
12    MR. BURKE:  All back-up documentation, internal
13 e-mails about these complaints, internal memos about the
14 complaints, all that stuff.
15    MR. BAUGHMAN:  Your Honor, we submit a detailed file
16 to the Federal Government to show them what we do to comply
17 with the consent decree.  And, you know, the information in
18 there should be sufficient for these plaintiffs as well.
19    Why don't they look at it first.  If they think
20 there's additional information that's appropriate, then they
21 can come back to us.  But we shouldn't have to conduct a
22 massive ESI search, costing hundreds of thousands of dollars,
23 when we're going to give them what we gave to the government.
24    THE COURT:  Didn't you do that research though before
25 you sent the reports to the FTC?

32

1     MR. BAUGHMAN:  Do what research, your Honor?
2     THE COURT:  Of the -- you said it's going to cost you
3 hundreds of thousands of dollars to do research.
4     MR. BAUGHMAN:  To do ESI searches?
5     THE COURT:  Right.
6     MR. BAUGHMAN:  We produced to the FTC the files that
7 we -- as we put them together, they're maintained, and then
8 they're given to the FTC.
9     THE COURT:  But you reviewed the files before --
10    MR. BAUGHMAN:  Yes.
11    THE COURT:  -- in order to do the report.
12    MR. BAUGHMAN:  Yes.
13    THE COURT:  And how difficult would it be then to
14 produce those files to the plaintiff?
15    MR. BAUGHMAN:  The FTC files?
16    THE COURT:  Yes.
17    MR. BAUGHMAN:  I don't think we're making a burdensome
18 argument on that, your Honor.  I think we're making an argument
19 that I don't think that's relevant.
20    THE COURT:  Okay.  It's relevant.  Okay.
21    MR. BURKE:  Judge, with regard to the internal
22 documentation regarding the complaints, I mean, what they gave
23 the FTC has already been doctored up by ADT specialists and
24 probably lawyers as well.
25    I think that the raw information --

33

1  THE COURT: I wouldn't accuse a lawyer of doctoring
2  them up.
3  MR. MURPHY: Massaging, your Honor.
4  MR. BAUGHMAN: Ridiculous.
5  MR. BURKE: It has, ostensibly, and we haven't seen it
6  yet, but ostensibly been altered or summarized at least in
7  order to be given to the FTC.
8  So we would ask for the raw data, the raw information
9  regarding these complaints, as well as all the e-mails and
10 memos that shot back and forth among ADT regarding such.
11 MR. BAUGHMAN: Your Honor, you're talking about 600 or
12 so complaints that I -- I frankly don't know what it is that I
13 would even look for. I mean, we give to the FTC the files that
14 we've put together to investigate these things. And this vague
15 assertion, well, you need to search all your e-mails for
16 everything that has anything to do with this is overly broad,
17 and I don't even know where to begin to respond to that.
18 THE COURT: Let's go back again to the documents that
19 you reviewed in order to compile your reports to the FTC.
20 Those documents should be produced --
21 MR. BAUGHMAN: Understood.
22 THE COURT: -- to the plaintiffs.
23 MR. BAUGHMAN: I understand your Honor's ruling on
24 that.
25 THE COURT: I'm going to order that.

34

1  Now you're talking about e-mails that went back and
2  forth. Once you look -- maybe you ought to look at what's
3  there and see if you need that.
4  MR. BURKE: Judge, what we're not talking about is --
5  I anticipate that we'll have memoranda or e-mails within ADT
6  saying, okay, we got -- we got five complaints regarding
7  Eversafe this month. You know, what are we going to do about
8  this? Are we going to -- are we going to sue those guys? Are
9  we going to send them a letter? And we don't have any of that
10 correspondence, of course, because they haven't given it to us.
11 But that stuff should exist; and if it doesn't, it bears on
12 willfulness. They turn a blind eye. And if it does, it also
13 bears on willfulness.
14 But, regardless, it bears on what they know about
15 these calls that are happening that they say they don't know
16 anything about.
17 THE COURT: What's your response to that?
18 MR. BAUGHMAN: Your Honor, I don't even know where to
19 begin to respond to that.
20 Why don't you look at the information that we provided
21 to the FTC? I mean, they want to say we're doctoring
22 information given to the government? Please.
23 Look at that information and tell us what you want or
24 give us some specifics of, okay, well, you know, based on this
25 information, we want you to run an e-mail search for X, Y, and

35

1  Z. Just asking us to generally search is not reasonable at
2  this point, your Honor.
3  Let's look at what we're going to give them and tell
4  us, based on that, what you want us to do.
5  MR. BURKE: Well, I think there's probably --
6  MR. BAUGHMAN: We'll consider it --
7  MR. BURKE: -- there's probably a complaint
8  department, and there are people who deal with these
9  complaints. I think that that's a reasonable place to search
10 for the stuff that I'm asking about.
11 MR. MURPHY: Your Honor, one of our requests was all
12 documents concerning ADT systems to receive and retain
13 complaints, claims, or allegations relating to telemarketing
14 ADT goods or services.
15 We tried to do this. We said, okay, give us documents
16 about how you maintain complaints and what your systems are
17 because, you know, whether they gave it to the FTC or not -- I
18 assume they should have given everything -- but we're entitled
19 to any complaints they got about, you know, telemarketing
20 violations, whether internally -- who knows? They could have
21 complaints from employees saying, I got a robocall at home
22 today for one of our products. And, your Honor, so that's
23 what -- I think that's all clearly relevant.
24 Now, it may be hard, you know, it may be difficult;
25 but certainly they must have systems in place to manage and

36

1  address these things.
2  MR. BAUGHMAN: All right. Here's what -- we told them
3  that we would give them a response explaining how that
4  department works, who is involved, who the people are.
5  Why don't we give them that response, they can look at
6  that, and then we can discuss what they want us to do with
7  respect to that.
8  MR. BURKE: I think the ship has passed. We asked for
9  that stuff in the meet and confer.
10 MR. BAUGHMAN: We offered to --
11 THE COURT: One at a time. One at a time.
12 Mr. Baughman is it?
13 MR. BAUGHMAN: Yes.
14 THE COURT: And you are Mr. --
15 MR. LEJA: Leja.
16 THE COURT: Leja. Okay. I want to make sure I'm
17 calling the right names here. Okay.
18 MR. BURKE: We asked for this stuff in the meet and
19 confer, and they said, oh, yeah, we'll give it to you some day.
20 And they still haven't. I don't know why they haven't, but
21 they haven't.
22 So, you know, I think the ship has passed. We asked
23 for the structure of the ESI in order to work with them. They
24 said no. They accused us of taking a deposition of counsel in
25 order to learn about how the ESI exists.

38

1  I think counsel should be prepared during a meet and
2  confer when they're going to claim that the ESI is overly
3  burdensome to tell us what the structure is so we can work on
4  it. And we specifically asked, and they said forget it.
5       MR. BAUGHMAN: We did not say "forget it." We said --
6       MR. BURKE: We certainly don't have a response.
7       MR. BAUGHMAN: We said that we would consider your
8  request and we sent you a long letter, and you never responded
9  to that.
10      If you want to sit down and discuss, after we tell
11 you -- we explain to you who is in the department, what you
12 think is appropriate to search, tell us; but we have tens of
13 thousands of employees at the company, and basically the
14 position they took at the meet and confer is search them all.
15 The --
16      MR. MURPHY: Your Honor, your Honor, let's remember
17 what every defendant does, every large corporation does when
18 they get a discovery request. Okay?
19      If I make a discovery request, there's no obligation
20 on their part to go ask all 25,000 employees about my discovery
21 request.
22      They have to make a reasonable due diligent, you know,
23 inquiry as a result of that request.
24      And so they know who the right people to talk to are,
25 they know what the departments are. This concept that, oh,

38

1  it's so unduly burdensome because we asked for everything
2  relating to robocalling so they're going to have to ask all
3  their employees. We know the Federal Rules don't embody that
4  kind of concept, which is Counsel and the Plaintiff -- the
5  Defendant have an obligation to do a diligent, reasonable
6  inquiry under the circumstances. But they haven't even done
7  that.
8       When you look at what they've told us time and time
9  again, it's always -- it always goes back to, This stuff isn't
10 relevant, it's unduly burdensome. They just haven't met their
11 obligations under the rules to do what they're supposed to.
12      We served these requests on April 28th. And so, you
13 know, at the end of May, we get nothing. Zip.
14      And then, you know, at the end of -- I guess by the
15 middle of July, we finally get, you know, a little bit. The
16 summary report.
17      And so, you know, at some point, it's got to stop.
18      I mean, we're four, almost five months out from our
19 request, and we're continuing to be told, Oh, well, we'll give
20 you something, and then why don't you take a look at this and
21 see if that's enough.
22      Well, that's not -- that's not how discovery works.
23      It's not let me show you a couple of my cards and then
24 see if -- see if you like that or see if I need to give you
25 some more.

39

1  They need to meet their obligations and give us
2  everything, even if it's hard. You know, litigation is hard.
3  That's, you know, unfortunate, but that's the reality.
4       THE COURT: Okay. With regard to the e-mail among
5  the, I guess, employees of ADT regarding the compliance with
6  the robocalls, the robocalls --
7       MR. BURKE: Yes. We think that that stuff is clearly
8  relevant.
9       If there was no FTC factor here, that's what we would
10 be basing the entire discovery request on.
11      We're frankly kind of lucky that we've got this FTC
12 consent decree that ADT agreed, instead of getting sued longer,
13 to produce the stuff to the FTC. It already exists. It's the
14 easiest thing they can produce.
15      What we want is the internal documentation, e-mails,
16 memos, regarding complaints.
17      MR. MURPHY: And regarding, you know, this dealer,
18 TCPA and dealer compliance issues, which, again, if they're
19 getting complaints and they're not taking -- and they're
20 finding out, and they have correspondence with their dealers
21 about those complaints but then they don't do anything, you
22 know, they send letters but they don't terminate contracts,
23 again, in our view, that is the kind of conduct that we think
24 could give rise to liability.
25      If they're going to get customers through robocalls,

40

1  get complaints about robocalls, and then take no action as a
2  result of those complaints against those dealers, we think
3  that's clearly the kind of conduct that Judge Bucklo in her
4  decision intimated might be sufficient for our claims.
5       MR. BAUGHMAN: Your Honor, what I would suggest is we
6  give them this explanation of who is involved in the department
7  and who does what. We can do that within 15 to 20 days. And
8  then they can -- we can meet and confer about what they think
9  is appropriate to do vis-a-vis ESI with respect to those
10 people.
11      MR. BURKE: I think we're entitled to it all. I mean,
12 it's responsive to the interrogatory --
13      THE COURT: If there -- if there are e-mails going
14 back and forth discussing complaints and compliance or lack
15 thereof with the consent decree regarding robocop -- robocalls
16 or telemarketing, I think that's something that is certainly
17 relevant to the issue here, and I'm going to require that.
18      Now, how you get that, I'm not sure but -- but it's
19 all in ESI. It's all in ESI. And you put the right --
20      MR. BAUGHMAN: Your Honor, it's -- it is in ESI, and
21 it is expensive and challenging to retrieve; but I understand
22 your Honor's ruling, and we will speak with the plaintiffs'
23 lawyers about appropriate scope thereof.
24      THE COURT: How to get it, how to get it. Okay.
25      MR. BURKE: Okay. So the next category I think we

41

1  wanted to talk about is the marketing efforts of ADT and its
2  authorized marketers and other marketers.
3       ADT has given us two contracts. Both contracts
4  indicate that ADT has the right to obtain information. In
5  fact, one of them that has been designated as confidential, in
6  my view, says that ADT owns the information, that it's actually
7  the property of ADT. So we would ask that the request
8  regarding marketing in Section C be compelled.
9       MR. MURPHY: And, your Honor, again, we get back to
10 the issue of they want to, again, try to limit, you know, limit
11 what they give us in terms of whether it's just Eversafe or one
12 of these dealers.
13      I mean, our requests are broader than that because,
14 again, we want to learn what the entire relationship is between
15 ADT and these authorized dealers.
16      Now, they want to keep coming before the Court and
17 saying, oh, these authorized dealers are independent
18 contractors.
19      Well, how am I supposed to challenge that assertion
20 without looking at all the facts and circumstances that make up
21 that relationship?
22      And so we all know it's not as simple as looking at
23 the contract. You have to look at how the relationship works.
24 And, you know, again, it gets back to the same issue in terms
25 of the communications between those people regarding their

42

1  telemarketing efforts, the knowledge regarding how those people
2  are coming up with the customers they are sending ADT's way,
3  and whether or not ADT has ever taken any sort of punitive
4  action against any of these authorized dealers.
5       That bundle of request, again, we think goes to the
6  heart of this matter, which is we're going to get this defense
7  that our authorized dealers are just -- you know, they're
8  independent agents and we don't really control them.
9       Well, the only way we can challenge that is by looking
10 at their documentation to make an assessment in terms of what
11 arguments we can raise to dispute that contention that they're
12 independent. And we think that when we get those documents,
13 we'll be able to, you know, persuade the Court that that's not
14 the nature of this relationship and that ADT controls it and
15 drives it and --
16      MR. BAUGHMAN: Your Honor --
17      MR. BURKE: The two categories of information --
18      THE COURT: Yes, you did -- defendant raised the
19 issue -- you did raise the issue that these people are
20 independent contractors.
21      As we all know, "independent contractors" is a term of
22 art.
23      You know, there are elements that you have to show to
24 determine whether an entity or individuals are independent
25 contractors or employees or agents.

43

1       And by raising the issue of independent contractors, I
2  think you're going to have to, if you're going to stick with
3  that, that these are independent contractors over which you
4  have -- over which you have no control -- what does control
5  mean? But over which you have no control, and that if they did
6  it, that you have no means of or right to discipline them for
7  doing it, including termination of the contracts of the
8  authorized -- with the authorized dealers, then that's
9  something you're going to have to produce evidence to show.
10      MR. BAUGHMAN: Your Honor, I don't think it's our
11 position that we have absolutely no control over them. But our
12 relationship with our authorized dealers is set forth in an
13 authorized dealer agreement. And most of them are pretty
14 similar. Some of them have a few amendments here and there.
15      We gave them the authorized dealer agreement with
16 Eversafe. Okay?
17      ADT has 500 dealers. It's a very large program. Of
18 those, only I think 60 are authorized to telemarket.
19      There is no allegation anywhere in the complaint that
20 ties any of those dealers, except for possibly Eversafe, to the
21 allegations in this complaint.
22      So I don't have a problem giving them information
23 about our relationship with Eversafe. And we gave them the
24 contract. We gave them our entire telemarketing compliance
25 file that we have on Eversafe. And we told them if you want

44

1  more information, we'll consider that.
2       But what I have a problem with, your Honor, is I don't
3  think they have -- it would be extremely burdensome to produce
4  information about our relationship with each of our 500 dealers
5  when there's no allegation tying them to the claims in this
6  complaint.
7       MR. BURKE: So I think, Judge, we would be willing to
8  limit our request to anything regarding --
9       THE COURT: Okay. He's amending his request now.
10      MR. BAUGHMAN: On the fly, your Honor.
11      THE COURT: Well, that should be good for you.
12      MR. BURKE: ==Anything regarding telemarketing or
13 improper telemarketing.== So that would include, you know, the
14 60 dealers that we're talking about that are authorized
15 telemarketers. And it would include any communications, any --
16 any communications with any -- any marketer at all, any third
17 party, regarding improper telemarketing. And it would
18 include -- so that would be, like, you know, ADT writing an
19 e-mail to -- if they say it didn't happen but, hypothetically,
20 to EMI, this company in California, saying, you know, hey,
21 what's going on with these phone calls? You know, we're
22 getting a lot of money from these phone calls, but it looks
23 like they may be improper.
24      It would include -- so we would ask that if there's --
25 there are any communications regarding telemarketing between

45

```
 1   ADT and any of these third parties, we would ask for the
 2   communications and the contracts with the entities that touch
 3   those communications.
 4            MR. BAUGHMAN:  So I think what they're asking for is
 5   basically everything having to do with telemarketing with 60
 6   dealers, none of which, except for Eversafe, have any tie to
 7   this complaint.
 8            Now, what -- your Honor has already ordered us to look
 9   for e-mails having to do with telemarketing compliance.
10            So I suspect that in the course of doing that, those
11   types of documents would come out.
12            But what I think is not reasonable is to ask us to
13   give every detail about our telemarketing relationship with 59
14   authorized dealers who there's no allegation have anything to
15   do with this complaint.
16            MR. MURPHY:  Your Honor, if I might, our request -- I
17   think our request is more specific than that.
18            We have -- our Request Number 19 says all doc --
19   contracts and documents concerning agreements entered into
20   between ADT and any of the following entities.
21            And, your Honor, there's a list of about 12 entities
22   there.
23            And those are entities that we uncovered through our
24   investigation and analysis that -- either through public
25   consumer complaints, through, you know, tying things back to
```

46

```
 1   our plaintiff -- there was some allegation that these folks
 2   were engaged in robodialing.
 3            But, again, the objection we got was that was unduly
 4   burdensome and it has no apparent connection to any of the
 5   three calls at issue in the amended complaint.
 6            MR. BAUGHMAN:  No.  We answered the interrogatory,
 7   your Honor.  We told them what our relationship as --
 8            MR. MURPHY:  It's a document request --
 9            THE COURT:  Okay.  The defense -- or the objection
10   that it has nothing to do with these three calls is not going
11   to -- it's not going -- it's not going to carry anything.
12            MR. BAUGHMAN:  Or any -- there's no allegation that
13   any of these other dealers have engaged in anything -- the
14   dealers -- all the dealers are required to comply with TSR.
15   Okay?
16            We have no basis for believing that they're not.
17            They've offered no evidence that they're not other
18   than some suggestion that Eversafe may have been involved in
19   one phone call.
20            We've agreed to give them that information, your
21   Honor, but there's no connection between these other entities.
22            And we asked -- we asked them for that information.
23   We asked them after our call, okay, well, explain to us how
24   these -- how these entities have some connection to this case
25   or any of the claims that are at issue, and they never
```

47

```
 1   responded.
 2            MR. MURPHY:  Your Honor, we have good faith basis that
 3   all these entities were involved not necessarily with our three
 4   consumer calls, but we've identified, you know, public consumer
 5   complaints regarding robodialing.
 6            A lot of these entities tie -- if you go to the
 7   websites, they all tie back with certain license -- ADT license
 8   numbers, so a lot of them actually tie to Eversafe.  We had a
 9   good faith basis for making these requests.  We didn't just
10   simply pick these 12 entities out of whole cloth.  I mean, we
11   did an investigation to find out that people are complaining
12   that they're getting robocalls from these entities, and these
13   entities have some affiliation with ADT.
14            It's not unduly burdensome.  If they don't have
15   anything, if there's nothing in their files, well, you know,
16   well, fine then.
17            Certainly it's relevant and likely to lead to
18   discoverable or relevant evidence.
19            MR. BURKE:  Absolutely.  This is a robocall case, and
20   we're asking for the stuff having to do with robocalls.  And I
21   think this just -- it's -- it's axiomatic that, you know,
22   within the class period, limited to that four years, this stuff
23   is discoverable.
24            THE COURT:  All right.  I agree.
25            You can see I have a very broad view of what's
```

48

```
 1   discoverable consistent with the Rules of Civil Procedure.
 2            MR. BURKE:  Judge, I think that covers the complaints.
 3            By the way, we're not dealing -- I want to make clear
 4   that our requests are not limited to authorized telemarketers,
 5   in quote, or --
 6            THE COURT:  Okay.  You --
 7            MR. BURKE:  -- or authorized marketers.  Those are
 8   terms of art that are defined in the consent decree.
 9            We're talking about marketers.
10            MR. BAUGHMAN:  We're talking about the 12 marketers
11   that they just said that they're discussing so we -- I'll tell
12   you that some of those, and we've told them this, we don't have
13   any association with, but we'll deal with the 12 that they have
14   listed in their discovery requests.
15            MR. BURKE:  We've got some other entities that I think
16   that we would like to include.
17            MR. BAUGHMAN:  Well, then you can serve a discovery
18   request.
19            THE COURT:  You have to re-serve that.
20            MR. BURKE:  All right.  I guess --
21            THE COURT:  What's the next one?
22            MR. BURKE:  -- the last category, because I think
23   we've covered the complaints, we've covered the marketing --
24            THE COURT:  The EBR.
25            MR. BURKE:  Yes, the EBR and the class lists.
```

49

1  MR. BAUGHMAN: Well, this one is impossible, your
2  Honor.
3  MR. BURKE: Judge, we've got -- they tell us they have
4  60 authorized telemarketers, and that is a term of art. I'm
5  using that --
6  MR. BAUGHMAN: 60 authorized dealers who are permitted
7  to telemarket.
8  MR. BURKE: All right. They have contractual
9  relationships with those 60, maybe not with the others, but
10 they have contractual relationships with those 60.
11 And the contract that we have, the only one that
12 they've shared, is extremely one-sided.
13 It says ADT owns the information relating to
14 marketing. They own it. It belongs to them.
15 MR. BAUGHMAN: That is not correct.
16 MR. BURKE: That's Exhibit I, Judge.
17 MR. BAUGHMAN: Exhibit I is our authorized
18 telemarketing agreement. It is not the authorized dealer
19 agreement. Very different entity.
20 MR. BURKE: You said there were 60 authorized
21 telemarketers. Actually, we learned that today. During the
22 discovery conferences, he'll deny it, but Counsel told me there
23 was one.
24 MR. BAUGHMAN: There is one authorized telemarketer.
25 They're different terms.

50

1  THE COURT: Everlast or --
2  MR. BAUGHMAN: No. Your Honor, I think we've been
3  very clear about this, and it's clear in the documents. There
4  is an authorized telemarketer that is defined by the consent
5  decree, which is the way they defined it, is a person who works
6  for ADT to do telemarketing for ADT.
7  Authorized dealers are very different.
8  Authorized dealers are not authorized telemarketers.
9  They're different. They're completely different concepts.
10 THE COURT: What is Eversafe?
11 MR. BAUGHMAN: Eversafe is an authorized dealer, your
12 Honor.
13 THE COURT: Dealer. Okay.
14 MR. BURKE: I don't understand the distinction that's
15 been made this morning with 60.
16 MR. BAUGHMAN: 60 authorized dealers who are
17 permitted --
18 THE COURT: How many? 500 telemarketers?
19 MR. BAUGHMAN: No.
20 MR. BURKE: Oh, I see.
21 MR. BAUGHMAN: There's 500 authorized dealers. Okay?
22 Of those, 60 are permitted to telemarket. The rest certify
23 that they will not telemarket.
24 MR. BURKE: And what's the one?
25 MR. BAUGHMAN: The authorized telemarketer. Very

51

1  different.
2  We have a contract with a company called 1-2-1 Direct,
3  which we've given to them and which we've given all the
4  information to the FTC about, that does authorized
5  telemarketing for ADT. It is not an authorized dealer.
6  MR. BURKE: I --
7  MR. BAUGHMAN: This is why it would be helpful to meet
8  and confer about this.
9  MR. BURKE: No, it's not helpful to meet and confer
10 because we asked for all this stuff, and this is the first time
11 I've ever heard the number "60" ever. I've heard "500" all
12 over the place -- excuse me.
13 I've heard 1 and I've heard 500, but I've never heard
14 60.
15 MR. BAUGHMAN: It's in the documents we gave them.
16 THE COURT: Okay.
17 MR. BURKE: These 60 are entities that ADT knows are
18 telemarketing.
19 I don't think we should limit anything to anything
20 less broad than these companies that ADT knows are making
21 telemarketing calls.
22 THE COURT: Rather than the 12 that he's talking
23 about, are you talking about you want 60?
24 MR. BURKE: 60 if they're not included in the 12 --
25 MR. MURPHY: Your Honor, to be --

52

1  THE COURT: Hold on, hold on. Wait, wait, wait.
2  MR. MURPHY: We specifically asked on those 12
3  entities for everything they have between those two contracts
4  so we can figure out that relationship.
5  A lot of this stuff when it comes to these other --
6  these 60 authorized telemarketers, that's covered under a lot
7  of our other requests in terms of things about complaints,
8  things about -- we have a lot of requests about compliance,
9  which is tell us what you do when it comes to your
10 telemarketing compliance. You know, do you send letters to
11 these people? Do you monitor -- you know, some of these folks
12 are supposed to have third-party monitoring agreements. Do you
13 monitor those? I mean, that -- I think that falls under some
14 of the other requests that your Honor has already sort of
15 granted. I think those 12 entities in particular, we have a
16 very broad scope in terms of we want to see everything between
17 the two of you so we can get a sense in terms of that
18 relationship to try to sort of limit it to get to this
19 independent contractor issue, your Honor, and understand those
20 relationships.
21 MR. BURKE: We would ask with regard to the class
22 information --
23 THE COURT: Let Mr. Baughman --
24 MR. BAUGHMAN: Your Honor, the information about what
25 they're looking for keeps shifting here.

53

1  They've asked for information about 12 dealers, your
2  Honor -- or 12 entities, and we've agreed -- your Honor has
3  ordered us to provide information about that.
4       What we're talking about now I think -- I, frankly,
5  I'm not sure what we're talking about.
6       They want EBR information from our authorized dealers.
7  And as I read their motion, they basically want us to take our
8  discovery requests and give them to all of our 500 dealers and
9  say respond.
10      We -- there is no authority that would require us to
11 do that.
12      These are third parties that they can subpoena that
13 have their own lawyers.
14      I, frankly, have read their papers a few times, and I
15 still am not entirely sure what it is that they want us to get
16 from our authorized dealers.
17      MR. MURPHY:  Your Honor, they know what the EBR is.
18 They know what that defense is.  All we've asked is give us all
19 documents related to that if you're going to raise that as a
20 defense.
21      THE COURT:  They haven't raised it yet.  They reserved
22 the right to do it.
23      MR. BURKE:  I don't know if that flies.  We've asked
24 for the list of calls that their authorized telemarketers and
25 their authorized dealers that do telemarketing have made.

54

1       MR. BAUGHMAN:  No.
2       MR. BURKE:  There are -- yes, we have.  We've asked
3  for those list of calls.  We know those calls exist.  ADT knows
4  that these people are making calls.  We've asked for those
5  lists.
6       Then with regard to each people -- each person, each
7  call on each of those lists, we've asked for the EBR or the
8  prior expressed consent for the call.  That's precisely what
9  we've asked for them to ask these companies that they know are
10 doing telemarketing.
11      MR. BAUGHMAN:  They have asked for documents relating
12 to robocalls, meaning pre-recorded messages made by these
13 entities.
14      ADT does not telemarket using pre-recorded messages.
15      Our authorized dealers are not permitted to telemarket
16 using pre-recorded messages.
17      And we have no idea what calls it is that we're
18 talking about.
19      The three calls at issue here prove the point, your
20 Honor.
21      We had to serve subpoenas in order to find out who was
22 making these calls.
23      So they're asking us to pull together information that
24 we have no idea what it is.
25      MR. BURKE:  It's -- actually, it's not true.  The case

55

1  has to do both with pre-recorded calls and automatic telephone
2  dialing system calls.
3       The Desai call was made to a cellular telephone.
4       And both automatic telephone dialing system calls and
5  pre-recorded messages are prohibited to be made to cellular
6  telephones.  Only pre-recorded messages are prohibited to be
7  made to residential lines.
8       So the requests are broader than what ADT is leading
9  on here.
10      MR. BAUGHMAN:  Your Honor, this is what it says in
11 Footnote 3 of the plaintiffs' brief.  This class -- the class
12 in this case consists of all persons ADT or someone on behalf
13 called in order to sell --
14      COURT REPORTER:  Please slow down.
15      THE COURT:  You need to --
16      MR. BAUGHMAN:  I'm sorry, I'm a fast talker.
17      "The class in this case consists of all persons ADT or
18 someone on its behalf called in order to sell ADT products and
19 services using a pre-recorded message within the statute of
20 limitations."
21      And there is -- that's the class.  And, your Honor, I
22 can go into -- I don't think it's relevant but, I mean, I think
23 Judge Bucklo, by finding a distinction between "make" and
24 "initiate," basically said that issue is out of the case
25 because there is no dispute we didn't make the Desai call.

56

1       THE COURT:  Well, I don't think she really -- she
2  didn't say that only if you show that they either made it or
3  initiated it.
4       MR. BAUGHMAN:  What she -- I think what she did, your
5  Honor, was draw a distinction between the word "make," which
6  has to do with using automated telephone messages, and
7  "initiate."
8       And she said unlike the word "make," "initiate" is
9  broad enough to include encouraged or prompted.
10      THE COURT:  Okay, well --
11      MR. BURKE:  Regardless, it's all reasonably -- it all
12 falls within the scope of discoverable information.
13      The Desai call was to a cellular telephone.  There are
14 different implications to telephones -- cellular telephones
15 than there are to residential lines.  There's different burden
16 of proof for the defense.  It's clear and convincing evidence
17 for residential lines.  Well, I would argue it's clear and
18 convincing for cell phones, too, but there is -- I would
19 acknowledge there's an argument that it's preponderance of the
20 evidence.  And there are different prohibitions.
21      Pre-recorded calls are illegal to residential lines
22 and cell phones.
23      And automatic dialing system is illegal as to cell
24 phones without regard to whether there's a pre-recorded
25 message.

57

 1        And I think that that's the distinction that ADT is
 2  making here when it says we don't make robocalls.
 3        MR. BAUGHMAN:  We also don't make --
 4        MR. BURKE:  When I say "robocall," I mean a call
 5  that's -- an automated call.
 6        MR. BAUGHMAN:  And, your Honor, we also do not make
 7  automated calls to cell phones as prohibited by the statute
 8  so --
 9        MR. BURKE:  Well, of course they're going to deny
10  liability --
11        MR. BAUGHMAN:  Your Honor, this is where -- we're
12  losing focus on the point here.
13        The point is I don't know what calls they're talking
14  about because we didn't make any calls using pre-recorded
15  messages.
16        As far as I know, our authorized dealers didn't make
17  any calls using pre-recorded messages.
18        The evidence in this case shows that the three calls
19  that we're talking about were made by three different entities
20  that have no apparent connection to each other who ADT knew
21  nothing about until we served subpoenas.
22        So at a minimum, your Honor, this request is
23  premature.  There's no way I can answer it.
24        MR. MURPHY:  Your Honor, there is --
25        MR. BURKE:  He hasn't asked.

58

 1        MR. MURPHY:  There is.  If he says he doesn't have
 2  any, then he doesn't have -- I mean, it seems to me if I make a
 3  request for something and you say, "I don't do this, I don't
 4  have this," well, then the response is, "And I object because
 5  it's unduly burdensome" or the response is, "We don't have
 6  documents that are responsive to that request."
 7        MR. BAUGHMAN:  It doesn't mean that the document
 8  doesn't exist.
 9        MR. MURPHY:  They do a reasonable search, as they're
10  supposed to under the rules, and they come back and tell me
11  they found something or they didn't --
12        THE COURT:  What do you want them -- with regard to
13  this particular category.
14        MR. BURKE:  I want them to go to their people that
15  they know do telemarketing and ask them about automated calls
16  and ask them about the pre-recorded message calls.  Ask them to
17  produce a list of all calls that fall into those categories,
18  along with whatever evidence they have that there is an EBR or
19  consent.
20        MR. BAUGHMAN:  Your Honor, the automated -- I mean, I
21  think it's unduly burdensome and irrelevant to go ask 60
22  authorized dealers and I guess others about information where
23  there's no evidence tying them in any way to this -- to the
24  allegations in the complaint.
25        MR. BURKE:  These are --

59

 1        MR. BAUGHMAN:  But it's certainly -- you know,
 2  Mr. Burke is trying to slip in the word "automated."  I mean, I
 3  don't know what that means, and it's not an issue in the case.
 4  They've defined their class as people involving pre-corded
 5  messages.  That's the issue.
 6        THE COURT:  ==Okay.  I'm going to grant that motion --==
 7  ==that portion of the motion because even though you haven't --==
 8  ==you haven't raised affirmative defense of EBR or expressed==
 9  ==consent, you know, I fully expect, I've had so many of these==
10  ==cases thus far, I fully expect that's going to come up anyway,==
11  ==realistically.  Yes.==
12        MR. BAUGHMAN:  Can I just get some clarification?
13        So as I understand Mr. Burke's request, it's to ask
14  the 60 dealers and other people who -- ask the 60 dealers that
15  we have who telemarket for a list of calls they made using
16  pre-recorded messages.
17        THE COURT:  Authorized dealers, right.
18        MR. BURKE:  And automated telephone dialing systems.
19        MR. BAUGHMAN:  No.
20        MR. BURKE:  Something that has the capacity to dial
21  without human intervention.
22        MR. BAUGHMAN:  It is perfectly legal to use an
23  automatic -- automated dialing system to call residential
24  phones.
25        MR. BURKE:  Not cell phones.

60

 1        MR. BAUGHMAN:  Well, it's perfectly legal to do it to
 2  residential phones --
 3        MR. BURKE:  Okay.  We'll limit it to cell phones --
 4        THE COURT:  ==To cell phones, limit it to the cell==
 5  ==phones.==
 6        MR. BURKE:  Absolutely.
 7        MR. BAUGHMAN:  Your Honor, their own class definition
 8  doesn't include that.  It only includes pre-recorded messages.
 9        MR. BURKE:  We'll limit it to cell phones.
10        THE COURT:  Limit it to cell phones.  You guys know
11  what he's asking for.
12        Anything else?
13        MR. BURKE:  That's all, Judge.
14        THE COURT:  ==Okay.  So the motion is granted.==
15        How much time do you need to comply with that?
16        MR. BAUGHMAN:  45 days, your Honor.
17        THE COURT:  Okay.  That's reasonable.  45 days.
18        MR. BAUGHMAN:  And I -- the motion is granted to the
19  extent discussed in the record today.
20        THE COURT:  Right.  That's why I have a court reporter
21  today rather than doing it with the -- with the system here.
22  So that -- the transcript is going to be longer than normal,
23  and I want to make sure we had a court reporter.
24        And I'm going to say that the motion is granted as
25  narrowed perhaps in some instances during oral argument.

63

1  MR. BAUGHMAN: Your Honor, could I -- I threw out the
2  45 days without -- we can get much of this stuff in 45 days, I
3  think.
4      The more difficult issue involves
5  electronically-stored information.
6      It is very difficult to pull that information. I
7  mean, basically you have to go through -- for e-mails you have
8  to go through person by person. There's various security --
9  ADT does work for the defense department, so it has to be run
10 through various security screening. It just takes a while to
11 get that. So I would just request the Court's indulgence to
12 maybe not give me a firm deadline on ESI yet.
13     THE COURT: How about 60 days?
14     MR. BAUGHMAN: That might be challenging, your Honor.
15     THE COURT: No, if you need more time, you can tell
16 them --
17     MR. MURPHY: We'll work with them. We're going to be
18 reasonable.
19     THE COURT: I'll only get a motion if you guys can't
20 work that out.
21     MR. BAUGHMAN: Understood, your Honor. I just want to
22 make it clear that on that issue, we'll obviously produce stuff
23 on a rolling basis, but I don't know that we can do it in 60
24 days.
25     THE COURT: Okay. I'll just -- I'll put 60 days on

62

1  it, and then I'll also indicate that I expect the parties if
2  they've been unable to meet the deadline that they will confer
3  with the plaintiff counsel and deal with it.
4      MR. BURKE: Why don't we set a status around that
5  date?
6      THE COURT: That's what I'm going to do.
7  October 21st. That's a Friday.
8      MR. BAUGHMAN: The only -- I raise the point, your
9  Honor, we do intend to bring in additional parties next week,
10 so I don't know how that's going to affect sort of scheduling
11 with status conferences to the extent --
12     THE COURT: We're just starting. If you're going to
13 bring in additional parties, they'll have to be served, of
14 course, before they can appear.
15     MR. BAUGHMAN: Some of them might be a little tough to
16 serve, but we're going to do our best.
17     THE COURT: All right.
18     MR. BURKE: Maybe the third parties will help them
19 respond to the discovery.
20     THE COURT: Okay. 60 days. And then I'll indicate
21 that I expect you guys to work together to get this done.
22     MR. BAUGHMAN: Very good. Thank you, your Honor.
23     MR. BURKE: Thank you, your Honor.
24     THE COURT: You're welcome.
25     (Proceedings concluded.)

C E R T I F I C A T E

I certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter.

/s/ Gayle A. McGuigan          August 24, 2011
_____        _____
Gayle A. McGuigan, CSR, RMR, CRR    Date
Official Court Reporter